Summers, J.
It is said that the circuit court ruled that the hoard of county commissioners is *322 without power to locate a county ditch in or over a living stream of water, or, in other words, to convert a living stream of water into a county ditch.
The contention on the part of the defendant in error in support of this ruling is, in brief, that the hoard of commissioners has only such power as has been expressly conferred; that power had been conferred upon it to construct ditches or drains, and also to straighten, widen or deepen streams and to remove dams; that these powers are distinct so that one does not comprise the others; that the word “watercourse,” when used in the statutes relating to ditches, is used as synonymous with drain, and does not include a stream, and that, therefore, the hoard of county commissioners may not, in the ditch proceeding, widen, straighten or deepen á stream, or convert it'into a ditch.
The plaintiff in error contends that: “Under the general authority to locate and construct county ditches they could he located anywhere if found conducive to the public health, convenience and welfare, with possibly the one exception that the same could not he so located as to destroy or supersede a public use theretofore appropriated. There being no limitation and there being full provision for' such' construction, anywhere, with full provisions for compensation, etc., our claim is that the subsequent provision for straightening, widening and deepening streams did not and does not have the effect to limit or abrogate the power already in force and operation, hut only provided a manner of straightening, widening, etc., streams without the construction and location of a county ditch. ’ ’
• “The- county commissioners already had the power to- locate and construct a county ditch upon *323 and over the stream. The new provision did not limit the power of the commissioners as to county ditches and was not so intended, hut it provided a manner for the straightening of streams in cases where a county ditch might not be feasible or desirable. It is a provision relating solely to streams and the improvement of same without even the pretense of superseding, abrogating or limiting any existing power or right in the commissioners as to county ditches.” Attention is also directed to section 4448, Revised Statutes, in which it is provided: “The word ‘ditch’ as used in this chapter shall be held to include a drain or watercourse.”
It does not follow that a power is unlimited because granted in general terms and without words of limitation. Regard must be had for the circumstances existing at the time the power is granted. If from these it clearly appears that the legislature could not have intended the power should comprise a particular thing then the power to that extent is limited just as effectually as if the act had contained express words of limitation. That the legislature did not intend to confer power to convert a stream into a ditch .clearly appears from the circumstances existing at the time of the legislation, and it just as clearly appears from the language used, that the word “watercourse,” as used in the ditch law is synonymous with the word “drain.”
In the early history of the state water-power was the only power in use for the operation of mills and manufactories, and the interests of the state were thought to be so largely dependent upon the utilization of that power that riparian rights were watched with jealous care. So it was when ditches and drains were first made subjects of legislation. At *324 that time land was so cheap that ditching was comparatively unimportant and the legislature would aot have authorized the destruction of a waterpower in order to provide a ditch. It was not until ■some years later that the matter of drainage became so important that tradition has it a member of this court was heard to say, that the great North West, meaning thereby the northwest part of the state, must be ditched even if it is necessary to break the •constitution. Then streams were not converted into ditches and such is not now the practice.
In Reeves v. The Treasurer of Wood County, 8 Ohio St., 333, 343, the learned judge writing the opinion notices the importance of drainage to a portion of the state and reviews the legislation respecting it. The first act noticed is an act passed March 26, 1841 (39 O. L., 122), entitled “An act providing for the appointment of commissioners of sewers in •certain counties of this state.” It authorized the ■court of common pleas in certain counties, on application of the proprietors of “meadows, marshy and low lands, or grounds which are injured by the overflowing of waters, and of swampy land which may be rendered valuable by draining the same, to grant a commission of sewers to such, and so many able and discreet persons as they shall judge expedient, for clearing and removing the banks and obstructions of the passages of the water in rivers, brooks, streams or ponds, which occasion the overflowing and drowning of meadows, swamps and low lands; and also for the draining of swamps, and other unprofitable lands; and also for damming, to prevent the water from overflowing marshy and flat lands; * and the commissioners shall have power to do the service aforesaid, and shall also *325 have power to enter upon any adjoining lands in the most convenient place or places, to open drains through such adjacent lands, to the nearest and most convenient watercourse or watercourses, for the purpose of carrying off the water from such meadows, swamps, marshy, low, or flat lands.”
In 1853 (51 O. L., 351), the act of 1841 was repealed and it was provided, ‘ ‘ that the trustees of townships shall have the power on application of the parties, to enter upon any lands in their township, to view any watercourse, or proposed ditch, for the purpose of draining the lands of one or more persons, and, in case the parties interested shall he unable to agree where said watercourse shall be opened, or said proposed ditch shall be cut, said trustees shall cause said watercourse or ditch to be located, and surveyed, and shall set apart to each person interested in the said watercourse or ditch, such portion of the same, to be by him opened, as shall, by said trustees, be deemed just and right, according to the benefit to be derived from the opening of said watercourse or ditch.” This act was repealed in 1854 (52 O. L., 92) by an act in which many of its provisions were incorporated, and in 1857 (54 O. L., 112) the act of 1854 was amended, but no change was made that will throw any light upon the question under consideration. In 1859 (56 O. L., 58) the act of 1857 was repealed and substantially the same power that theretofore had been granted to township trustees was- taken from them and vested in the county commissioners. They were authorized “to cause to be established, located and constructed, as hereinafter provided, any ditch, drain or watercourse, within such county.” This act was amended in 1867 (64 O. L., 66, and 64 O. L., 143), *326 and in 186.8 (65 O. L., 107) it is supplemented by granting authority to county commissioners, “in case where any ditch, drain or watercourse has been established and constructed under the provisions of the act to which this is supplemental, to cause the same to be cleaned out, widened or deepened. ’ ’ And section 8 of the act also was amended in the same year (65 O. L., 125). And in 1869 (66 O. L., 86), power was granted to township trustees to remove or cause to be removed, any drift, timber, or other obstructions that might hinder the free passage of water in the natural channel in any stream or streams of water known as living streams of water, but it was expressly provided that nothing in the act should be construed to interfere with any mill dam or water works already constructed or to be constructed upon any stream, or the placing of flood gates across any such stream. In 1877 (74 O. L., 22) the act of 1869 giving the township trustees power to remove drift, timber, and other obstructions from streams, was repealed and the power was given to the county commissioners.
It seems to be apparent not only from the provisions of these various acts, but also from the wording of the same, that the legislature did not use the word “watercourse” in a sense that would include a living stream, but in the sense of a drain for water.
Mr. Farnham, in his valuable work “Water and Water Rights,” volume 2, chapter 19, points out that in many of the early decisions the courts have confused watercourses with ravines and swales, or other natural drains, and says that the two are entirely distinct and are controlled by different rules, though in some respects the rules with respect to drainage are the same as those with respect to *327 watercourses, and, further, that a watercourse must be a stream of such character as to give rise to riparian rights. The term is not used in this sense at all in the legislation to which we have, called attention.
In the courts below plaintiff in error raised the question of jurisdiction to enjoin by motion to dissolve the temporary injunction on the ground that the plaintiff had an adequate remedy at law.
In Haff v. Fuller, 45 Ohio St., 495, it is held that The final orders of the township trustees establishing ditches may be reversed by petition in error for errors apparent on the record; and that such procedure and not injunction is the appropriate remedy for the correction of such errors, and in the opinion it is said that the same rule applies to the final orders of county commissioners establishing ditches; that the rule has been applied where the errors so appearing render the proceedings void for want of jurisdiction.
In the present case the want of jurisdiction does' not arise from some error appearing on the record of the proceedings but from want of power in the commissioners to act at all.

Judgment affirmed.

Shauck, C. J., Price, Spear and Davis, JJ., concur.